UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
JOHNNY RAY CHANDLER, SR.,                           )
                                                    )
        Plaintiff,                                  )
                                                    )
        v.                                          )        Civil Action No. 06-0664 (PLF)
                                                    )
UNITED STATES PAROLE                                )
  COMMISSION, et al.,                               )
                                                    )
        Defendants.                                 )
_____ )


OPINION

        Plaintiff Johnny Ray Chandler, Sr., challenges the United States Parole

Commission's ("USPC") imposition on his parole of a Special Sex Offender Aftercare

Condition. This Condition entailed Chandler's supervision by a devoted Sex Offender Unit, as

well as his assignment to sex offender therapy. Mr. Chandler — imprisoned after his conviction

on a plea to robbery, armed robbery, and assault with a dangerous weapon in the D.C. Superior

Court — has never been convicted of a sex crime. He contends that USPC lacks any legal

authority to impose the Special Sex Offender Aftercare Condition on him. He further argues

that, even if USPC does possess such authority under the statutory and regulatory framework that

governs its activities, USPC has violated his constitutional right to procedural due process by

failing to provide him with requisite safeguards in advance of its imposition of the Condition.

        The challenged events occurred in 2005 and 2006, but the focus of Chandler's

pending motion for summary judgment is prospective, because in late 2006 Chandler was

returned to prison for violating conditions of his parole. He currently remains incarcerated, but

will be re-released on parole in October of 2014. He seeks various forms of declaratory and injunctive relief ahead of his mandatory re-release, at which point it is anticipated that the Special Sex Offender Aftercare Condition again will be imposed.

The Court has carefully considered the briefs filed by the parties, the oral arguments presented by counsel on June 27, 2014, the relevant legal authorities, and the relevant portions of the record in this case. The Court will grant judgment to the plaintiff on his procedural due process claim, but will deny judgment to him on his statutory claim. The Court therefore will order USPC to provide Chandler with certain procedural protections, as delineated in this Opinion and set forth in an accompanying Order, in advance of any future imposition of the Special Sex Offender Aftercare Condition as a term of Chandler's parole.[1]

## I. BACKGROUND

### A. Factual Background

Johnny Ray Chandler, Sr., is currently incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania. Mr. Chandler was convicted in 1991 on his plea to

---

[1]     The papers considered in connection with the pending motion include: plaintiff's second amended complaint ("2d Am. Compl.") [Dkt. No. 87]; plaintiff's motion for summary judgment and memorandum in support thereof ("Pl.'s Mot.") [Dkt. Nos. 132 and 132-1]; plaintiff's statement of material facts not in dispute ("Pl.'s Stmt. of Facts") [Dkt. No. 132-2]; defendants' opposition to plaintiff's motion ("Defs.' Opp.") [Dkt. No. 140]; defendants' counter statement of material facts ("Defs.' Stmt. of Facts") [Dkt. No. 140-1]; plaintiff's reply ("Pl.'s Reply") [Dkt. No. 141]; the Administrative Record ("AR") [Dkt. No. 125]; Treatment Contract & Attendance Policy ("Treatment Contract") [Dkt. No. 4 at 12-13]; transcript of motions hearing held on December 18, 2012 ("Dec. 2012 Mot. Hrg. Tr.") [Dkt. No. 145]; defendants' notice of supplemental authority [Dkt. No. 147]; plaintiff's notice of supplemental authority [Dkt. No. 148]; plaintiff's notice of filing revised proposed order and record citations, and request for judicial notice ("Pl.'s Supplemental Memo.") [Dkt. No. 149]; plaintiff's revised proposed order ("Pl.'s Rev. Proposed Order") [Dkt. No. 149-1]; defendants' response to plaintiff's revised proposed order and request for judicial notice, and motion to supplement record ("Defs.' Supplemental Memo.") [Dkt. No. 151]; plaintiff's opposition to motion to supplement record ("Pl.'s Opp. to Mot. to Supp.") [Dkt. No. 155]; and defendants' additional response to plaintiff's revised proposed order and request for judicial notice ("Defs.' Additional Resp.")[Dkt. No. 156].

robbery, armed robbery, and assault with a dangerous weapon in the Superior Court of the

District of Columbia.  AR 0001-10.  He was released on parole in June of 2005.  AR 0086,

00170.  Like all D.C. parolees, Chandler was assigned to be supervised by the Court Services

and Offender Supervision Agency for the District of Columbia ("CSOSA"), a "Federal agency

providing supervision of adults on probation, parole, and supervised release" in the District.

COURT SERVS. & OFFENDER SUPERVISION AGENCY FOR THE DIST. OF COLUMBIA,

http://www.csosa.gov (homepage accessed on July 28, 2014).

Shortly after Chandler's release into the community, two women who formerly

had been professionally involved with Chandler's criminal proceedings and incarceration — one

as his court-appointed appellate counsel, and another as his case manager — contacted CSOSA

to report that Chandler had written personal letters to them that the women found to be

disturbing.  The letters to the attorney had been sent during a three-week period in September of

1998, see AR 0092-0105; the letters to his case manager in the early weeks of his release on

parole in 2005.  See AR 0135-38.  Because of their contents, the letters caused concern among

CSOSA officials, who determined that Chandler was a "potential sex offender."  See AR 0129.[2]

Consequently, CSOSA scheduled Chandler for a Psychosexual Risk Assessment and placed him

on GPS monitoring pending its outcome.  See AR 0129-30, 0140-46.

---

[2]      As explained infra at 19 n.10, the record is unclear regarding exactly what actions
on CSOSA's part constituted this "determination."  The phrase "potential sex offender" appears
in the record in just one document, a memorandum written by Chandler's CSOSA Community
Supervision Officer ("CSO") and addressed to USPC.  In it, the CSO reports that by early July
2005, after CSOSA's receipt of the letters and complaints from Chandler's former lawyer and
case manager, "it was determined that the offender is a potential sex offender."
AR 0129.  No indication is given whether this determination simply reflected an internal
consensus among CSOSA officials, or whether it was memorialized in any manner other than by
this reference in an interagency memorandum.

The assessment was conducted by Dr. Phyllis Brodie, a licensed clinical psychologist affiliated with the Center for Clinical and Forensic Services, Inc. AR 0140-46. On July 14, 2005, Dr. Brodie conducted a clinical interview of Chandler that covered a range of subjects, including Chandler's family upbringing, his educational and employment histories, his experiences using illicit substances, and his sexual and romantic histories. See AR 0141-44. In addition, Dr. Brodie reviewed evidence including Chandler's letters to his former attorney, a "Sexual History Questionnaire," and the views of Chandler's CSO. See AR 0140. In a Psychosexual Risk Assessment report issued on August 12, 2005, Dr. Brodie expressed her opinion that "Mr. Chandler is at high risk for perpetrating sexual violence." AR 0145. She therefore recommended that Chandler's case be transferred to CSOSA's Sex Offender Unit, "to provide more comprehensive supervision with a focus on sexual behaviors." AR 0146. Dr. Brodie further recommended that Chandler "follow the behavioral contract designed for use with sex offenders on probation"; that he "participate in a sexual history polygraph" to be used "to establish a risk management and treatment plan that addresses the entirety of his risk"; that he "be referred for sex offender treatment services," preferably involving group therapy; that any potential romantic partner "be informed of his history of provocative sexual behaviors"; and that he be referred to a psychiatrist to explore potential medication options. Id.

Over the next several months, CSOSA maintained GPS monitoring of Chandler, although Chandler violated this condition several times. AR 0130. In October 2005, Chandler's CSO twice informed him that he would remain under GPS surveillance until his supervision was transferred to the Sex Offender Unit. Id. In late December of 2005, a USPC official presented Chandler with a form entitled "Modification of Release Conditions," which provided notice that a recommendation would be made to USPC decision-makers that Chandler "be placed under

supervision with the Sex Offender Unit with a more comprehensive focus and placed on GPS monitoring[,] based on the psychological assessment" conducted by Dr. Brodie. AR 0152-53. Mr. Chandler signed the form, thereby agreeing to the proposed modification of his release conditions and waiving a ten-day waiting period for raising objections. See AR 0152. Chandler has maintained, however, that he signed the form only because he was coerced by the threat of being laden with a parole violation if he did not sign it. Pl.'s Stmt. of Facts ¶ 41. A few days later, Chandler authored a memorandum addressed to USPC and purporting to be a "Notice of Appeal," in which he protested the recommendation that he be placed under the supervision of the Sex Offender Unit. AR 0147-49. In his memorandum, Chandler asserted that, "I am not a Sex Offender and it would be a slanderous and grave defamation [o]f my character if I am referred to the Sex Offenders Unit." AR 0148.

A Parole Commissioner approved the modification of Chandler's parole conditions on January 17, 2006, see AR 0152-53, and on the following day USPC issued a formal Notice of Action stating that the agency had ordered that Chandler "be subject to the Special Sex Offender Aftercare Condition." AR 0154. The Notice explained that as a part of this special condition, Chandler would be required to "participate in an in-patient or out-patient mental health program as directed by [his CSO], with special emphasis on long-term sex offender testing and treatment." Id. Chandler also was informed that he was "expected to acknowledge [his] need for treatment." Id. In addition, the Notice stated that Chandler would be subject to GPS monitoring along with a curfew and potential geographic limitations on his movements. Id.

The Notice of Action emphasized that USPC's decision was "not appealable." AR 0154. Despite this admonition, Chandler penned another "Notice of Appeal" to USPC, in

which he again protested his assignment to CSOSA's Sex Offender Unit and expressed outrage at being considered a sex offender. AR 0155-56. Chandler also paid an in-person visit to an office of the USPC, at which he appeared "agitated and upset over the sex offender condition" added to his parole, as reported by the USPC official who received him. AR 0158. That same day, February 1, 2006, a USPC Hearing Examiner wrote a letter to Chandler that acknowledged Chandler's objections to the Special Sex Offender Aftercare Condition, yet which warned that "[t]he condition will not likely be removed until those involved in your treatment and supervision recommend removal." Id.

In the meanwhile, Chandler's case had been transferred to the supervision of CSOSA's Sex Offender Unit, to which Chandler reported on January 27, 2006, for an initial interview and orientation. See AR 0159, 0170. Two months later, Chandler signed a "Treatment Contract & Attendance Policy" issued to him by the Center for Clinical and Forensic Services, where CSOSA had assigned him to undergo sex offender treatment. The contract pertained to "Phase 1" of the treatment program, and it purported to "outline[] the expectations for participating and the potential consequences of not appropriately participating" in this introductory phase of treatment. Treatment Contract at 1. Among the sixteen items that Chandler acknowledged by signing the form were the following: "all high risk activities," which are "defined by the treating sex offender therapist," would be "reported immediately to the appropriate parties to ensure the safety of the community"; a requirement that Chandler discuss his sexual history, and possibly undergo a sexual history polygraph; an understanding that Chandler would be provided with assignments related to particular treatment objectives, which he would be required to complete, along with active and honest sharing of information about himself and the acceptance of feedback from his therapists; and an agreement to refrain from

looking at sexually explicit or erotic materials.  Id. at 1-2.  Just a month later, however,

Chandler's treatment regimen was halted when Chandler filed a lawsuit against the Center for

Clinical and Forensic Services; as a result, USPC initiated a process to transfer Chandler's

treatment to another CSOSA service provider.  See AR 0171.

        The record does not indicate whether that transfer actually occurred, as by August

of 2006, Chandler was back in custody due to four violations of his parole conditions: three

relating to GPS monitoring, and the fourth resulting from a failure to appear for drug testing.

See AR 0197-0202.  He underwent a parole revocation hearing on October 30, 2006, which

resulted in a recommendation by a USPC Hearing Examiner that Chandler's parole be revoked

and that he serve an additional 24 months in prison — an above-guidelines sentence.  AR 0202.

USPC ultimately revoked Chandler's parole and sent him back to prison for a term of 16 months,

which also constituted an above-guidelines sentence that was justified by reference to Chandler's

noncompliance with the GPS and curfew conditions that were "part of [his] sex offender

treatment."  AR 0210.  The Notice of Action ordering Chandler's parole revocation included a

provision stating that upon reparole, Chandler would again be subject to the Special Sex

Offender Aftercare Condition.  AR 0209.

        In 2008, Chandler's presumptive reparole date was rescinded, and his case was

continued to a presumptive reparole date of September 19, 2011.  AR 0349-53, 0361-62.

Another rescindment occurred in 2011, at which time Chandler was ordered to remain

incarcerated until his statutorily mandated release date of October 21, 2014.  AR 0558-70, 0572.

*B.  Procedural History*

Chandler initiated this action in the Superior Court of the District of Columbia shortly after his reincarceration in 2006.  He litigated *pro se* for several years, until this Court — to which the United States had removed the action — appointed counsel for him.  Prompting this appointment was the Court's resolution of a motion to dismiss or for summary judgment, filed by the original set of defendants, which the Court granted in part and denied in part.  Chandler v. James, 783 F. Supp. 2d 33 (D.D.C. 2011).  In that decision, the Court dismissed a slew of meritless constitutional and common law claims that Chandler had asserted against a variety of parties; most of these claims were based on events tangential or unrelated to his challenge to USPC's imposition of the Special Sex Offender Aftercare Condition.  See id. at 39-43.  Yet the Court also recognized the potential merit in Chandler's contention that his due process rights had been violated by USPC's conduct.  See id. at 43.  As the Court then explained, "the one potentially meritorious claim raised by Mr. Chandler is far too complex to be effectively prosecuted by a prisoner proceeding *pro se*, and the legal issues it presents are sufficiently novel that the Court declines to rule on them in the absence of any counsel for the plaintiff."  Id.

Chandler's appointed counsel then filed a second amended complaint on their client's behalf, which now is the operative complaint in this case.  In it, Chandler names as defendants USPC, CSOSA, and several individual officials of both agencies in their official capacities.  He asserts two legal claims against them:  First, he contends that USPC's imposition of the Special Sex Offender Aftercare Condition was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because USPC allegedly lacks any statutory or regulatory authority to impose such conditions on persons never convicted of a sex crime.  See 2d Am.

Compl. ¶¶ 77-80.  Second, Chandler maintains that, even if USPC does possess the legal authority to take such action, it nonetheless violated his Fifth Amendment right to procedural due process by failing to provide him with a hearing and other protections prior to imposing the Condition.  <u>See</u> <u>id</u>. ¶¶ 59-76.

In January 2012, the defendants filed a motion to dismiss Chandler's second amended complaint, or, in the alternative, for summary judgment.  Defs.' Motion to Dismiss and/or for Summary Judgment [Dkt. No. 98].  The defendants raised a number of arguments, including that Chandler's complaint should have been brought as a petition for a writ of habeas corpus; that he lacked Article III standing; that his claims were moot, not ripe, and barred by claim or issue preclusion; that sovereign immunity barred his claim for money damages; that Chandler lacked a cognizable liberty interest deserving of due process protections; and that, even if Chandler did possess such an interest, the defendants had provided him with all the process due by law.  Chandler subsequently withdrew his request for damages, but maintained that declaratory and injunctive relief were appropriate.  <u>See</u> Pl.'s Opposition to Defendants' Motion to Dismiss and/or for Summary Judgment at 7 n.8 [Dkt. No. 103].

The Court heard argument on the defendants' motion on December 18, 2012, and issued an oral ruling that same day, in which the Court denied the motion to dismiss.  With respect to the defendants' Article III arguments, the Court recognized that because Chandler is scheduled for mandatory release in October 2014 and, at that point, it is nearly certain that USPC will again impose the Special Sex Offender Aftercare Condition, Chandler possessed standing to assert his claims for declaratory and injunctive relief.  For the same reasons, these claims were ripe and not moot.  <u>See</u> Dec. 2012 Mot. Hrg. Tr. at 68-73.  The Court also rejected each of the defendants' other arguments for dismissal or for summary judgment.  <u>See</u> <u>id</u>. at 75-82.

Chandler's instant motion for summary judgment followed. The Court heard argument on this motion on June 27, 2014, and the parties have since filed brief supplemental memoranda pursuant to the Court's request. <u>See</u> Pl.'s Supplemental Memo; Defs.' Supplemental Memo. In addition, at the Court's request, Chandler has filed a revised proposed order setting forth his specific claims for relief. <u>See</u> Pl.'s Rev. Proposed Order. In it, Chandler separates his requested relief by reference to his two distinct legal theories. Under his statutory argument — that USPC lacks any legal authority to prescribe sex offender conditions to persons in Chandler's position — he requests a declaration to that effect, along with an injunction forbidding the defendants from enforcing these conditions in the absence of his conviction for a sex crime. <u>Id</u>. at 1. Under his due process argument, Chandler requests declaratory and injunctive relief that would entitle him to several procedural safeguards in advance of USPC's anticipated reimposition of the Special Sex Offender Aftercare Condition, including a hearing at which Chandler would be able to challenge the government's evidence before a neutral decision-maker. <u>Id</u>. at 2.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> Fed. R. Civ. P. 56(a), (c). In making that determination, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014) (per curiam); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255; <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir. 2011). A disputed fact is "material" if it "might affect the

outcome of the suit under the governing law." Talavera v. Shah, 638 F.3d at 308 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir. 2012). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." Barnett v. PA Consulting Group, Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)); see also Tolan v. Cotton, 134 S. Ct. at 1866; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.[3]

### III. CHANDLER'S STATUTORY ARGUMENT

In his most sweeping claim for relief, Chandler asks this Court to declare that USPC lacks any legal authority to "designate [him] as a sex offender or subject him to sex offender supervision conditions in the absence of a decision by an independent decision-maker that Mr. Chandler 'committed a registration offense' as that phrase is defined in D.C. Code § 22-4001(9)." Pl.'s Rev. Proposed Order at 1. The cited statutory provision comprises a part of the District of Columbia's Sex Offender Registration Act of 1999 ("SORA"). Chandler's argument centers on SORA's definition of what it means to be a "sex offender" — namely, a person who has "committed a registration offense." D.C. CODE § 22-4001(9). The phrase "committed a registration offense" is defined to mean that the offender either was convicted or

---

[3] The government asserts that the appropriate legal standard to apply in this case is that for review of agency action based on an administrative record. But this is not a case involving "review of a final agency action under the Administrative Procedure Act, [in which] the [normal summary judgment standard] does not apply because of the limited role of a court in reviewing the administrative record." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).

was found not guilty by reason of insanity of a "registration offense," or was "determined to be a sexual psychopath." D.C. CODE § 22-4001(3)(A). SORA further specifies which crimes qualify as registration offenses. D.C. CODE § 22-4001(8).[4] Chandler argues that because SORA defines who is and who is not a sex offender by reference to specific registration offenses, USPC therefore lacks legal authority to designate parolees as sex offenders and to subject them to sex offender-specific parole conditions if those parolees never have been convicted of such an offense. He premises this argument on the Administrative Procedure Act, under which a reviewing court must "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

USPC's authority to prescribe conditions of parole for D.C. parolees appears at D.C. Code § 24-404(a), which provides that USPC "may authorize [a prisoner's] release on parole upon such terms and conditions as the Commission shall from time to time prescribe." This authority is supplemented by associated federal regulations, which explain that while all D.C. parolees are subject to certain "general conditions of release," USPC also "may impose a condition other than one of the general conditions of release if [USPC] determines that such condition is necessary to protect the public from further crimes by the releasee and provide adequate supervision of the releasee." 28 C.F.R. § 2.85(b) ("[s]pecial conditions of release").

---

[4]     Defendant CSOSA is tasked with the operation and maintenance of D.C.'s sex offender registry, and the federal regulations governing CSOSA's operations in this regard incorporate by reference SORA's provisions defining those persons who must be listed on the registry. See 28 C.F.R. § 811.1(a).

The provision cross-references another regulatory section, 28 C.F.R. § 2.204(b)(2), which lists examples of such special conditions.[5]

Chandler essentially maintains that SORA's definition of "sex offender" impliedly restricts USPC's authority to prescribe conditions of parole, when those conditions implicate the sex offender label or other conditions associated with that label. This argument hinges on Chandler's contention that he was "classified" as a "sex offender" by USPC. Because SORA defines with specificity the category of persons who may be so classified — and because Chandler does not fall within that category, never having been convicted of a registration offense — he maintains that USPC lacks the authority to take the actions that it did.

The problem with Chandler's argument is that there is no basis in the D.C. Code or elsewhere to draw such a connection between SORA and the separate statutory and regulatory provisions governing USPC's authority to prescribe conditions of parole. Tellingly, he is unable to point to any language in SORA, in D.C. Code § 24-404(a), or in the Code of Federal Regulations that might support this linkage. Nor can Chandler point to any case in which a court has drawn such a connection; indeed, at oral argument, his counsel admitted that he was unaware of any court that had ever embraced such a theory. SORA defines who can lawfully be designated as a sex offender for purposes of *that* statute — a designation which entails the entry of an order by the Superior Court of the District of Columbia certifying that the defendant is a sex offender, and which also obligates the defendant to register as such. See D.C. CODE § 22-4003(a). But as the government highlights, see Govt. Opp. at 5-6, Chandler was never designated in this manner. And he has never been required to register as a sex offender. That SORA governs certain terms of release for those who do qualify as sex offenders for SORA's

_____

[5]     Although the regulatory text speaks of "releasees," these provisions apply to District of Columbia parolees as well. 28 C.F.R. § 2.85(f)(2).

purposes does not mean that USPC's discretion to oversee parolees is constrained by that definition.

Chandler further maintains that USPC and CSOSA lacked a legal basis for classifying him as a "potential sex offender," arguing that "[n]owhere does the D.C. Code or CSOSA regulations contain this phrase." Pl.'s MSJ at 11 n.5. But it does not matter that those sections of the D.C. Code and the Code of Federal Regulations that govern the defendants' authority lack any mention of designations or conditions pertaining to sex offenders or "potential" sex offenders. These provisions do not provide exhaustive lists of the actions that USPC may take with respect to parolees; to the contrary, USPC's authority is defined in broad terms, authorizing "[a prisoner's] release on parole upon such terms and conditions as the Commission shall from time to time prescribe." D.C. CODE § 24-404(a).

In sum, there is no basis to conclude that USPC lacks the authority to prescribe a Special Sex Offender Aftercare Condition upon a parolee who is not a "sex offender" as defined in the D.C. Sex Offender Registration Act. The Court therefore will deny summary judgment to Mr. Chandler with respect to his claim brought under the Administrative Procedure Act.[6]

## IV. CHANDLER'S DUE PROCESS ARGUMENT

Chandler maintains that even if USPC possesses the authority to impose sex offender parole conditions on persons who have not been convicted of any sex crime, USPC may not do so without providing the parolee the protections of due process. Chandler asks this Court to enjoin the defendants from imposing or enforcing sex offender conditions on his upcoming reparole, unless and until he is first provided several specific safeguards, including: (1) prior

---

[6] For this reason, the defendants would appear to be entitled either to judgment on this claim under Rule 56 of the Federal Rules of Civil Procedure, or to dismissal for failure to state a claim under Rule 12(b)(6), but they have made no motion seeking such relief.

written notice that these conditions are being considered; (2) a hearing at which Chandler will have an opportunity to challenge the government's evidence before a neutral decision-maker; and, should the conditions again be imposed, (3) a written statement by the decision-maker explaining the rationale for authorizing their imposition. Pl.'s Rev. Proposed Order at 2.

The Court analyzes a procedural due process claim in two steps. First, it considers "whether there exists a liberty or property interest which has been interfered with by the State." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989). If that question is answered in the affirmative, the Court next "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Id. With respect to this case in particular, the Court emphasizes that Chandler's due process claim now is focused exclusively on the future, as he does not seek damages for the government's alleged violation of his rights in 2005 and 2006.[7] Rather, Chandler seeks relief from this Court that will protect him against the expected imposition without process of the Special Sex Offender Aftercare Condition upon his reparole in October of this year. Thus, although the Court's analysis focuses on what occurred to Chandler in the past, these facts gain their significance as an indication of what is threatened to recur.

As a preliminary matter, the Court concludes that there are no genuine issues of material fact that would preclude judgment as a matter of law. The main disputed fact identified by the parties concerns whether Chandler was "coerced" into signing the Modification of Release Conditions form by which he purportedly waived his ability to protest USPC's

---

[7]    Chandler does request that the Court declare his entitlement to good time credits for the time that he lost due to his parole revocation in 2006, which, he claims, was caused primarily by his violation of the GPS portion of the Condition. Pl.'s Rev. Proposed Order at 4. But he has offered little argument to support this request for relief, which hinges on the assertion that, but for imposition of the Condition, his parole would not have been revoked at that time. The Court will deny this request for relief.

announced intention to transfer his case to CSOSA's Sex Offender Unit. <u>Compare</u> Pl.'s Stmt. of Facts ¶¶ 40-41, 43, <u>with</u> Defs.' Stmt. of Facts ¶¶ 41, 43; <u>see also</u> Pl.'s MSJ at 2, 6. But this fact is not material, in part because the government does not rely on an argument that Chandler has waived his right to assert a due process claim. <u>See</u> Defs.' Opp. at 27 (stating that Chandler "revoked his initial consent . . . [and] the Commission allowed him to do so"). Moreover, this fact could not affect Chandler's ability to assert a prospective challenge to USPC's present intention to impose the Special Sex Offender Aftercare Condition upon his reparole.

The parties also dispute whether the record sufficiently indicates that the sex offender therapy program to which Chandler was assigned entailed behavior modifying treatment — which, as explained further below, seemingly is required under the relevant case law — but the Court concludes that there is no genuine dispute on this point either. The issue is addressed in further detail <u>infra</u> at 21-24.

## A. *Liberty Interest*

The parties agree that the liberty interest inquiry here is controlled by the Supreme Court's decision in <u>Vitek v. Jones</u>, 445 U.S. 480 (1980), in which the Court held that Nebraska prison officials had violated a state prisoner's due process rights by transferring him to a mental hospital where he would be subjected to psychiatric treatment involving mandatory behavior modification, without having provided the prisoner with a prior hearing. <u>Id</u>. at 491-94. Several federal circuits have since applied <u>Vitek</u> to situations in which a prisoner or parolee who never was convicted of a sex crime nonetheless has been subjected to conditions generally reserved for sex offenders. <u>See</u> <u>Renchenski v. Williams</u>, 622 F.3d 315 (3d Cir. 2010); <u>Coleman v. Dretke</u>, 395 F.3d 216 (5th Cir. 2004), <u>reh'g en banc denied</u>, 409 F.3d 665 (5th Cir. 2005) (per curiam); <u>Kirby v. Siegelman</u>, 195 F.3d 1285 (11th Cir. 1999) (per curiam); <u>Neal v. Shimoda</u>, 131

F.3d 818 (9th Cir. 1997); see also Chambers v. Colorado Dep't of Corrections, 205 F.3d 1237 (10th Cir. 2000) (relying in part on Vitek v. Jones). These courts generally have held that "the stigmatizing effects of being labeled a sex offender, when coupled with mandatory behavioral modification therapy, triggers an independent liberty interest under the Due Process Clause." Renchenski v. Williams, 622 F.3d at 328.[8]

This test — under which the combination of stigma and treatment together implicate a protected liberty interest — draws on the second of two alternative rationales relied upon by the Supreme Court in Vitek. In its first approach, the Court located a liberty interest created by state law — namely, the Nebraska statute providing for the transfer of prisoners to mental hospitals, see Vitek v. Jones, 445 U.S. at 488-91 — whereas under its second approach the Court recognized a liberty interest that existed "independently of [state law]." Id. at 491. The Court identified this latter interest by asking whether the "consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime." Id. at 493.[9] And the Supreme Court held that, on the facts before it, "the

---

[8]     Some courts addressing similar factual circumstances have relied instead on the "stigma-plus" liberty interest framework articulated by the Supreme Court in Paul v. Davis, 424 U.S. 693 (1976). See, e.g., Vega v. Lantz, 596 F.3d 77, 81-82 (2d Cir. 2010); Grennier v. Frank, 453 F.3d 442, 445 (7th Cir. 2006); Gwinn v. Awmiller, 354 F.3d 1211, 1216 (10th Cir. 2004); Gunderson v. Hvass, 339 F.3d 639, 644-45 (8th Cir. 2003). But the Court agrees with the parties that Vitek v. Jones, as it has been applied by the courts of appeals in the context of sex offender conditions, provides the more apt framework for the liberty interest analysis.

[9]     The Supreme Court subsequently has characterized this approach as asking whether a state's restraint of a prisoner's freedom "exceed[s] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." Sandin v. Conner, 515 U.S. 472, 484 (1995); see also id. at 478-79 & n.4 (noting that in both Vitek and Washington v. Harper, 494 U.S. 210 (1990), the Court had "found that the Due Process Clause itself confers a liberty interest in certain situations" (emphasis added)). The Court in Sandin distinguished this inquiry from that employed where state law serves as the source of the liberty interest asserted by a complaining prisoner. See id. (recognizing situations where state law grants "freedom from restraint which . . . imposes atypical and significant hardship on the inmate

stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." Id. at 494.

Chandler's claim falls squarely within Vitek's scope. USPC, by assigning Chandler to be supervised by CSOSA's Sex Offender Unit and by ordering that he undergo sex offender therapy, both marked him with the stigma of the sex offender label and, concomitantly, mandated his participation in treatment aimed at modifying Chandler's purportedly unhealthy sexual behaviors. See AR 154 (USPC Notice of Action) ("You shall participate in [a] . . . mental health program . . . with special emphasis on long-term sex offender testing and treatment."). These two elements — stigma and treatment — trigger a liberty interest warranting protection under the Due Process Clause. See, e.g., Renchenski v. Williams, 622 F.3d at 327-28; Coleman v. Dretke, 395 F.3d at 222-23.

## 1. Stigma

The government maintains that, where the sex offender label has not been formally imposed and publicized in some fashion, there can be no stigmatizing effects stemming from it. See Defs.' Response to Rev. Proposed Order ¶¶ 3-6; Defs.' Opp. at 20. But as the Fifth Circuit has explained, "Vitek does not require publication to establish stigma," given that "the plaintiff in Vitek had not been required to register the fact of his classification as mentally ill, and the [Supreme] Court nowhere indicated that his treatment providers would not keep his records confidential." Coleman v. Dretke, 409 F.3d at 668 (denying petition for rehearing en banc). The court in Coleman therefore concluded that, "[w]hether or not [the parolee] must now

_____

in relation to the ordinary incidents of prison life."); see also Renchenski v. Williams, 622 F.3d at 325-26, 329 (marking this distinction); Kirby v. Siegelman, 195 F.3d at 1290-91 (same).

list his name on an official [sex offender] roster, by requiring him to attend sex offender therapy, the state labeled him a sex offender — a label which strongly implies that [he] has been convicted of a sex offense and which can undoubtedly cause 'adverse social consequences.'" Id. (quoting Vitek v. Jones, 445 U.S. at 492); see also Doe v. U.S. Parole Comm'n, 958 F. Supp. 2d 254, 267 (D.D.C. 2013) ("Even if [Doe's classification as a sex offender] is not made public . . . Doe himself is fully aware of it and may well feel a stigma because of it.").

Likewise, Chandler's assignment to supervision by CSOSA's Sex Offender Unit marked him with the "inchoate stigmatization" of the sex offender label, Chambers v. Colorado Dep't of Corrections, 205 F.3d at 1242, regardless of whether he was formally "labeled" as such, or required to register as a sex offender, or forced to disclose his status as a supervisee of the Sex Offender Unit. See Coleman v. Dretke, 409 F.3d at 668; see also Wills v. U.S. Parole Comm'n, 882 F. Supp. 2d 60, 76 (D.D.C. 2012) (concluding, in case involving imposition of Special Sex Offender Aftercare Condition on D.C. supervised releasee, that "[USPC] essentially 'classified' the plaintiff as a sex offender and CSOSA complied with that classification," although releasee was not required to register as a sex offender).[10]

---

[10] The parties spend a great deal of effort disputing the import of the term "potential sex offender," which, as noted supra at 3 n.2, appeared in a memorandum written by Chandler's CSO, Charles James, to USPC in October 2005. See AR 0129. In the memorandum, CSO James reports that based on CSOSA's receipt of the letters that Chandler had written to his former attorney and case manager, "it was determined that the offender is a potential sex offender." Id. This "determination" — the formality of which is left unexplained in the memorandum — occurred at some point prior to July 11, 2005. See id. The Court agrees with the Third Circuit that there exists "no [discernible] difference for stigmatization purposes between being labeled a sex offender and being labeled a possible sex offender." Renchenski v. Williams, 622 F.3d at 328-39. Furthermore, in this case the relevant stigmatizing event is USPC's placement of Chandler under the supervision of the Sex Offender Unit, with its associated requirement that he undergo sex offender treatment. In the circumstances, the Court need not address the question whether CSOSA's characterization of Chandler as a "potential sex offender" imputes a sufficient degree of stigma to trigger a liberty interest.

Furthermore, there appears to the Court a strong likelihood that, should Chandler again be placed under CSOSA's Sex Offender Unit's control, his sex offender supervision status could be disclosed to others. For one thing, the sex offender treatment to which Chandler was assigned includes group therapy of up to fifteen participants. See CSOSA COMMUNITY SUPERVISION SERVICES OPERATIONS MANUAL, Chap. X, at (G)(1)(c)(i), available at http://www.csosa.gov/about/policies/css/manual-toc.aspx ("CSOSA Operations Manual"). Disclosure of one's designation as a person in need of sex offender treatment — even to other persons similarly situated — casts stigma on the prisoner or parolee. See Renchenski v. Williams, 622 F.3d at 328 n.9 (rejecting state's argument that prisoner's "claim of stigmatization falls short," and relying on the fact that because the prisoner's "weekly therapy sessions are group therapy sessions, which comprise as many as fifteen inmates . . . his categorization as a sex offender would surely be known to the prison population"). In addition, CSOSA's Community Supervision Officers overseeing parolees assigned to the Sex Offender Unit are instructed to "perform unannounced home and employment visits," and to "regularly communicate with all valid collateral contacts." CSOSA Operations Manual, Chap. X, at (E)(2)(b), (e). Finally, Chandler's sex offender treatment contract stated that "all high risk activities" — which are to be "defined by the treating sex offender therapist" — would be "reported immediately to the appropriate parties to ensure the safety of the community." Treatment Contract at 1. The record therefore demonstrates a likelihood that Chandler's assignment to the Sex Offender Unit and his associated assignment to sex offender treatment will be disclosed, at least to those persons also assigned to such therapy and potentially beyond that circle.

2.  Mandatory Behavioral Modification Therapy

Chandler's demonstration of the second element of the <u>Vitek</u> standard —

participation in "mandatory behavioral modification therapy," <u>Renchenski v. Williams</u>, 622 F.3d

at 328 — also is contested by the government, which maintains that although USPC did assign

Chandler to undergo sex offender treatment, the record does not reflect that Chandler actually

received such treatment nor does it indicate what the nature of that treatment would have been.

<u>See</u> Defs.' Supplemental Memo. ¶¶ 4-8.  As to the first of these points, the record is somewhat

unclear.  Although Chandler did report to the Sex Offender Unit for an orientation session on

January 27, 2006, and then signed a treatment contract with his assigned treatment provider in

March of 2006, the record does not indicate with certainty whether he actually underwent any

therapy sessions before he filed a lawsuit against the provider in April 2006.  <u>See</u> AR 0171.  The

Court concludes, however, that whether Chandler actually began receiving the treatment to

which he was assigned is immaterial to resolution of his procedural due process claim.  Simply

put, USPC's *assignment* of Chandler to sex offender treatment, in conjunction with the

associated stigma, implicates a protected liberty interest.  To undergo sex offender therapy was a

required condition of Chandler's parole, and had he not been returned to custody in August of

2006, his treatment assignment would have been transferred to another service provider.  <u>See</u> AR

0171 (noting that, as of June 16, 2006, Chandler's "treatment [was] in the process of being

transferred to another CSOSA provider").  Moreover, Chandler now requests prospective relief

to protect him against the likelihood that, upon his mandatory reparole in October of 2014,

USPC will again place him with the Sex Offender Unit and assign him to treatment.  Chandler's

entitlement to this relief does not hinge on whether in 2006 he did or did not attend the

introductory sessions of what was meant to be "long-term sex offender testing and treatment." AR 0154.

The more serious question raised by the government is whether the record indicates that the sex offender therapy to which Chandler was assigned — and to which he presumably will again be assigned upon his reparole — can fairly be described as "intrusive" behavior modifying treatment, or whether, instead, this treatment is little different in nature than the general mental health therapy that was an element of Chandler's original set of parole conditions.  See Defs.' Supplemental Memo. ¶¶ 7-8; Defs.' Opp. at 22.  The relevant cases, beginning with Vitek itself, all involved situations where the complaining prisoner or parolee had been assigned to undergo treatment whose aim was behavior modification, and which the courts have often characterized as being intrusive in some significant manner.  See, e.g., Vitek v. Jones, 445 U.S. at 494; Renchenski v. Williams, 622 F.3d at 327-28; Coleman v. Dretke, 395 F.3d at 223 & n.28; Kirby v. Siegelman, 195 F.3d at 1288, 1291-92; Neal v. Shimoda, 131 F.3d at 828-29; Wills v. U.S. Parole Comm'n, 882 F. Supp. 2d at 76; see also Coleman v. Dretke, 409 F.3d at 667-69 (denying petition for rehearing, and elaborating on panel's decision on this point).  The government fails to persuade the Court that CSOSA's regimen for sex offenders is anything other than the sort of treatment that these courts of appeals have found to satisfy the Vitek standard.

CSOSA's own Community Supervision Services Operations Manual includes a description of the therapy to which it subjects persons under the supervision of the Sex Offender Unit.  CSOSA's description begins with the statement that, "[g]iven that the treatment of sex offenders is *different from* traditional psychotherapy, such treatment should include" a number of specific features.  CSOSA Operations Manual, Chapter X, at (G)(1)(c) (emphasis added).  These

features include "[c]ognitive behavioral group therapy," with a "focus on learning to control and manage deviant behaviors"; "[u]tilization of relapse prevention techniques," as well as "techniques for reducing deviant sexual arousal"; "[w]ork toward continual reduction of minimization and denial"; "[c]onfronting the offender's thinking errors and distortions"; limited confidentiality; and the "use of physiological monitoring," including "plethysmographs and polygraphs." Id. In addition, Chandler's treatment contract with the Center for Clinical and Forensic Services featured items including a requirement that Chandler discuss his sexual history, and possibly undergo a sexual history polygraph, as well as an understanding that Chandler would be provided with assignments related to particular treatment objectives, which he would be required to complete, along with the acceptance of feedback from his therapists. Treatment Contract at 1-2. These features demonstrate that CSOSA requires those whom it places in sex offender therapy to undergo treatment aimed at modifying those behaviors considered to be problematic. See Wills v. U.S. Parole Comm'n, 882 F. Supp. 2d at 77 (characterizing CSOSA's sex offender treatment program as "intrusive psychosexual therapy").

The government contends, however, that even if some Sex Offender Unit supervisees are subjected to treatment that would satisfy the Vitek standard, the record here is equivocal regarding whether Chandler himself actually would have undergone such treatment. See Defs.' Response to Rev. Proposed Order ¶¶ 7-9. Specifically, the government makes reference to statements in the CSOSA Operations Manual providing that CSOs must provide certain forms of notice to persons residing with registered sex offenders, and it infers that because these requirements do not apply to persons not convicted of sex crimes, the Manual proves little regarding the nature of Chandler's assigned treatment. See id. ¶ 8 (citing Doe v. U.S. Parole Comm'n, 958 F. Supp. 2d at 261, which cited one of these provisions). The Court

concludes, however, that the existing record and CSOSA's own description of its sex offender treatment program extinguish any doubt that the treatment element of Chandler's Special Sex Offender Aftercare Condition easily compares to the programs involved in cases such as Renchenski, Coleman, Kirby, and Neal. Indications in the CSOSA Operations Manual that certain required forms of notice may apply only to registered offenders does not alter the fact that any sex offender treatment program to which a CSOSA supervisee would be assigned has as its primary aim the modification of the offender's sexual thinking and behavior.[11]

The Court has concluded that USPC's imposition of the Special Sex Offender Aftercare Condition upon Chandler's parole implicates a liberty interest that is protected by the Due Process Clause. Because USPC has expressed an intention to impose these same conditions upon Chandler's reparole in October of this year, which would then be enforced by CSOSA, Chandler is entitled to procedural protections before the defendants may undertake these actions. In Subsection IV.B, infra at 28-32, the Court describes the particular procedural safeguards that it concludes are due to Chandler. But before doing so, the Court addresses two additional issues identified by the parties.

---

[11] On July 3, 2014, the government filed a motion for an extension of time within which both to respond to the plaintiff's supplemental memorandum and to supplement the record with the declaration of a CSOSA official. But this motion also featured several pages of substantive argument that was responsive to Chandler's own supplemental memorandum. See Defs.' Supplemental Memo. Then, on July 25, 2014, the government filed what purported to be its actual "response" to Chandler's memorandum. See Dkt. No. 156. This submission was not timely filed. The Court has considered the arguments made in the government's July 3 filing, but it declines to consider the arguments in its untimely July 25 filing. In addition, because the government has withdrawn its request to supplement the record with the declaration of a CSOSA official, the government's motion for an extension of time to do so is hereby denied as moot. The plaintiff's motion to strike the government's late filing, see Dkt. No. 159, also is denied as moot, as is its further request in that motion for a default judgment. See id.

3. Psychological Risk Assessment, GPS Monitoring, and Curfew

First, the parties dispute whether CSOSA's having made Chandler undergo the Psychosexual Risk Assessment conducted by Dr. Brodie, in conjunction with the fact that CSOSA officials had earlier "determined" that Chandler was or might be a "potential sex offender," together suffice to trigger a liberty interest deserving of due process protections. Chandler maintains that he was due some form of process in advance of his assignment to undergo the Psychosexual Risk Assessment, while the government distinguishes this assessment from the behavior modifying treatment that is discussed in the relevant cases.

As the Court already has noted, the record does not clearly indicate the nature of CSOSA's "determination" of Chandler's status as a "potential sex offender." See supra at 19 n.10.  In addition, there is scant case law analyzing whether an *assessment* — which is but a step on the way toward requiring behavior modifying sex offender *treatment* — could, coupled with the requisite stigma, trigger a liberty interest under the due process clause.  No court of appeals has yet to face such a question; in the appellate decisions applying Vitek to the sex offender conditions context, the factual circumstances invariably have included the presence of behavior modifying treatment and therefore were closely analogous to the facts of Vitek itself.  See, e.g., Renchenski v. Williams, 622 F.3d at 327-28; Coleman v. Dretke, 395 F.3d at 223 & n.28; Kirby v. Siegelman, 195 F.3d at 1288, 1291-92; Neal v. Shimoda, 131 F.3d at 828-29.[12]

The parties have cited only one case in which this question has been squarely faced.  In Doe v. U.S. Parole Comm'n, Judge Bates held that since an assessment can be

---

[12]     The Third Circuit in Renchenski did discuss an assessment condition imposed on the complaining prisoner, but the goal of that assessment was "to ascertain the level of sex offender risk associated with each inmate in order to decide which therapy group (moderate/high or moderate/low) is most appropriate for the prisoner."  Renchenski v. Williams, 622 F.3d at 329.  The court specifically noted that there was no indication "that a possible outcome of the assessment is a determination that the inmate should not participate" in treatment.  Id.

distinguished from treatment — because an assessment "does not require [the releasee] to admit his need for treatment, undergo any treatment or therapy, or otherwise change his behavior in any way" — the appellate cases relying on <u>Vitek</u> "[did] not compel the conclusion that Doe has a protected liberty interest." 958 F. Supp. 2d at 267. Judge Bates therefore concluded that although there might be some degree to which the plaintiff's liberty interest had been implicated, the interest was less weighty than that at stake when treatment, rather than a mere assessment, was coupled with the stigma of the sex offender label. <u>See</u> <u>id</u>. at 269. And he held that the process provided to Doe satisfied this lower threshold. <u>Id</u>. at 274.[13]

      As an initial matter, it not clear whether Chandler possesses standing to maintain his challenge to the decision requiring him to undergo Dr. Brodie's Psychosexual Risk Assessment in July of 2005. Chandler does not seek monetary damages for this alleged violation of his constitutional rights; instead, he requests declaratory and injunctive relief in anticipation of USPC's reimposition of the Special Sex Offender Aftercare Condition upon his upcoming reparole. While USPC's intention to reimpose the challenged Condition is clearly supported by the record, there is no similar indication concerning a likelihood that Chandler will be subject to another risk assessment, nor that, if he were, the circumstances would be the same or similar to those that he experienced with Dr. Brodie. And to have standing to assert his claims for declaratory and injunctive relief, Chandler "must allege a likelihood of future violations of [his] rights" by the defendants. <u>Medelius Rodriguez v. U.S. CIS</u>, 605 F. Supp. 2d 142, 146 (D.D.C. 2009) (quoting <u>Fair Employment Council of Greater Washington v. BMC Mktg. Corp.</u>, 28 F.3d 1268, 1273 (D.C. Cir. 1994)); <u>see also</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983)

---

[13]      The plaintiff in <u>Doe</u> has appealed Judge Bates' decision; oral argument will be heard in this appeal on September 8, 2014. <u>See</u> <u>Doe v. U.S. Parole Comm'n</u>, No. 13-5279, Clerk's Order (D.C. Cir. June 10, 2014).

(holding that a plaintiff seeking injunctive relief must show a "real or immediate threat that [he] will be wronged again" to establish Article III standing).

With that said, there certainly exists the possibility that USPC or CSOSA could require Chandler to undergo a fresh Psychosexual Risk Assessment before reimposing the Condition. But on the facts presented to this Court regarding what occurred in 2005, the Court cannot conclude that CSOSA's assigning Chandler to undergo a one-time Psychosexual Risk Assessment is an action that certainly would trigger the protection of the Due Process Clause. To be sure, the Supreme Court's opinion in Vitek v. Jones did not appear to limit its reasoning to only those factual circumstances bearing a tight fit to the facts of that case. See 445 U.S. at 494 (holding that "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute *the kind of* deprivations of liberty that requires procedural protections" (emphasis added)); see also Sandin v. Conner, 515 U.S. at 484. Nonetheless, given the uniformity of the relevant circuit case law concerning the importance of behavior modifying treatment as an element of this standard — and without having been offered a compelling rationale to extend the reasoning of these cases — the Court declines to do so here.

The final issue warranting discussion with respect to the liberty interest inquiry concerns the role of the GPS monitoring and curfew requirements, which constituted elements of Chandler's Special Sex Offender Aftercare Condition. Chandler maintains that "where [GPS and curfew] conditions stem directly from the sex offender label," due process is required. Pl.'s MSJ at 18. This argument, however, would allow stigma alone to do all of the heavy lifting, by carrying along any condition somehow linked to it. GPS requirements, location monitoring, and curfews are special conditions often used by courts, pretrial services agencies, probation offices,

and parole commissions to either safeguard the community or minimize the risk of flight. The cases applying Vitek to this context, by contrast, have emphasized the fact that it is the coupling of stigma with a particular type of additional deprivation — namely, forced participation in behavior modifying treatment — that triggers a liberty interest. A simple linkage between stigma and some additional deprivation of liberty is insufficient to implicate the required protected liberty interest. And the Court concludes that GPS and curfew conditions — which, as noted, are commonly imposed conditions — are not the sort of "qualitatively different" restrictions of liberty that could serve as the additional factor that couples with stigma to implicate due process. Vitek v. Jones, 445 U.S. at 493.

Because the Court concludes that the assignment of Chandler to supervision by the Sex Offender Unit coupled with the concomitant requirement that he undergo behavior modifying sex offender treatment implicated a protected liberty interest, he is entitled to due process procedural protections in advance of USPC's future imposition of the Special Sex Offender Aftercare Condition upon his parole. The next question is what process is due in these circumstances.

### B. What Process Is Due to Chandler?

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Ralls Corp. v. CFIUS, No. 13-5315, 2014 WL 3407665, at *14 (D.C. Cir. July 15, 2014) (quoting Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 205 (D.C. Cir. 2001)). "In the seminal case of Mathews v. Eldridge, the United States Supreme Court established a three-factor balancing test to determine the 'specific dictates of due process.'" Id. (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Under this test, the Court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (quoting Mathews v. Eldridge, 424 U.S. at 335). Due process typically requires that the procedures include notice of the official action that is proposed, the factual basis for the proposed action, and the opportunity to be heard at a meaningful time and in a meaningful manner, as well as to rebut the evidence supporting the action. Id. at *15.

In this case, the private interest at stake is weighty, given the serious detriment caused by the sex offender stigma and the associated intrusive requirement that Chandler participate in long-term sex offender therapy aimed at behavior modification. Given the procedures employed by USPC — which involved notice to Chandler that the Special Sex Offender Aftercare Condition had been proposed, but no meaningful opportunity for Chandler to challenge the basis of this decision — the risk of erroneous deprivation of his liberty interest is considerable. USPC relied almost exclusively on the expert opinion of Dr. Brodie in determining that Chandler was at risk of perpetrating sexual offenses and that he required specialized supervision and treatment. See AR 0154 (Notice of Action). Dr. Brodie's assessment of Chandler involved subjective decisions to focus on particular features of Chandler's life history and his criminal offense record, as well as to link these historical events to her contemporaneous clinical examination of him. See AR 0140-46. Without discounting the value of Dr. Brodie's expert opinion, it is apparent that without an opportunity for Chandler to challenge both its basis and her conclusions before a neutral decision-maker, there is a serious

risk that USPC could impose the Condition without valid grounds for doing so, based only on the opinion of its chosen expert.

The probable value of additional procedural protections in this context — in particular, a hearing at which Chandler will be able to challenge the government's evidence and to counter it with his own — is evident. The government's interest in avoiding the burden of providing these procedures does not outweigh the value of enabling Chandler to protect the liberty interest at stake here. The added fiscal and administrative burdens do not merit denying such process, nor would the requirement of due process procedures leave the public unprotected from dangerous parolees. Additional procedural protections would merely ensure that parolees like Chandler who are assigned to the Sex Offender Unit actually belong there. Accordingly, the Court now turns to consider precisely what procedures USPC must provide to Chandler upon his upcoming reparole.

In his Revised Proposed Order, Chandler requests a number of protections:

(1) written notice that sex offender classification and conditions are being considered;

(2) a hearing, held sufficiently after the notice to permit him to prepare, at which disclosure is made of the evidence being relied upon for the classification and sex offender conditions;

(3) an opportunity at the hearing to be heard in person, to present documentary evidence, to present testimony of witnesses, and to confront and cross-examine witnesses called by the government, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

(4) administration of the hearing by an independent decision-maker;

(5) a written statement by the independent decision-maker as to the evidence relied on and the reasons for classifying him as a sex offender and imposing sex offender conditions; and

(6) effective and timely notice of all the foregoing rights.

Pl.'s Rev. Proposed Order at 2.[14]

The Court believes these procedures are appropriate in the circumstances and under the relevant case law. Chandler is entitled to a hearing in person, for which he will be able to adequately prepare, and at which he will be afforded the chance both to challenge the government's evidence and to present his own evidence in rebuttal, all before a neutral decision-maker. In addition, Chandler will be able to assert his challenge with the rights of confrontation and cross-examination, which, as explained by the Fifth Circuit in Meza v. Livingston, No. 09-50367, 2010 WL 6511727 (5th Cir. Oct. 19, 2010), are valuable procedural protections that are warranted in this context — at least where there is no risk that allowing their exercise would implicate safety concerns "within prison walls." See id. at *15. And there is no indication of such a risk here, where Chandler would be provided these rights before his release on parole. Chandler's ability to confront the government's witnesses, particularly its psychological expert, would help to ensure that he has a meaningful opportunity to rebut the factual and evaluative bases of USPC's effort to impose the Special Sex Offender Aftercare Condition. See also Renchenski v. Williams, 622 F.3d at 331-32 (providing substantially same set of procedural protections); Neal v. Shimoda, 131 F.3d at 830-32 (same). These rights, along with the others that Chandler proposes, will serve as adequate safeguards against the violation of his liberty.

---

[14] Chandler has not requested the right to assistance of appointed counsel in the proceedings that might take place before a USPC decision-maker, but the Court is confident that Chandler's present counsel will continue to serve their client's interests in these proceedings.

The government has failed to offer any viable alternatives, maintaining instead that the process provided to Chandler in 2005 and 2006 — consisting primarily of a summary rejection letter written in response to Chandler's *pro se* "Notices of Appeal" — would suffice to protect the liberty interest that Chandler holds in avoiding imposition of the Special Sex Offender Aftercare Condition.  Chandler is entitled to much more than this.  The Court therefore will substantially adopt the terms of the plaintiff's Revised Proposed Order, as set forth in the Order accompanying this Opinion, and issued this same day.

## V.  CONCLUSION

For the foregoing reasons, the Court denies judgment to the plaintiff with respect to his claim brought under the Administrative Procedure Act.  Because the Court concludes that the plaintiff has demonstrated a violation of his Fifth Amendment right to procedural due process, it grants judgment to the plaintiff on that ground.  In view of that determination, it sees no need to address the plaintiff's request for a declaratory judgment against the defendants.  An Order accompanies this Opinion, in which the Court sets forth the procedural protections to which Mr. Chandler is entitled should the defendants again attempt to impose the Special Sex Offender Aftercare Condition upon his parole.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 8, 2014